PENNSYLVANIA R. R. CO.

v.

UNITED STATES et al.

A. & M. TRADING CORP. et al.

v.

UNITED STATES.

RINN v. UNITED STATES.

GEARY

v.

UNITED STATES et al. and
related cases.

Civ. Nos. 385-52, 449-52, 973-50, 367-52, 974-50, 975-50, 976-50, 985-50, 299-51, 418-51, 432-51, 471-51, 472-51, 620-51, 621-51, 622-51, 623-51, 624-51, 625-51, 720-51, 730-51, 75-52, 349-52, 372-52, 373-52, 387-52, 445-52, 447-52, 448-52, 452-52, 453-52, 454-52, 457-52, 458-52, 459-52, 463-52, 465-52, 466-52, 467-52, 468-52, 469-52, 470-52, 471-52, 472-52, 473-52, 474-52, 475-52, 476-52, 479-52.

United States District Court
D. New Jersey.

July 29, 1954.

Carpenter, Gilmour & Dwyer, James D. Carpenter, Jersey City, N. J., for Pennsylvania R. R. Co. Stephen V. R. Strong, New Brunswick, N. J., Albert S. Schroeder, Philadelphia, Pa., Adrian J. O'Kane, Richard W. Palmer, New York City, of counsel; Thomas L. Morrissey, Milton A. Dauber, Jersey City, N. J., of counsel, on the brief.

Toner, Crowley, Woelper & Vanderbilt, Newark, N. J. and Wilentz, Goldman, Spitzer & Sills, Perth Amboy, N. J.; Kristeller & Zucker, Newark, N. J.; Stryker, Tams & Horner, Newark, N. J., and Louis J. Milano, South River, N. J., on the brief for A. & M. Trading Corp., and others.

Harry Green, Little Silver, N. J., for Ethel M. Geary.

Samuel M. Cole, Jersey City, N. J., for Frances Rinn.

FORMAN, Chief Judge.

In all there are forty-nine complaints pending in this court against the United States arising out of the explosion at the Port of South Amboy, New Jersey, on May 19, 1950. It is agreed in stipulations between the United States and all of the plaintiffs that the complaints in the above-entitled four actions are representative of all of the others and together they contain all of the allegations imputing liability to the United States for the negligent acts of its agents and employees. The United States has made motions under Rule 12 (b)(6) of the Fed.Rules Civ.Proc., 28 U.S.C.A., in the four cases to dismiss as to it the complaints filed therein on the ground that they fail to state a claim upon which relief may be granted. All of the parties have further agreed that the decision of the court shall be treated as its "decision with respect to the bases of legal liability of the United States" in all of the cases reserving their rights in connection with the form of order to be filed and appellate review.

The following are pertinent allegations from the complaint filed by the Pennsylvania Railroad Company against

Warren E. Burger, Asst. Atty. Gen., M. M. Heuser, Dept. of Justice, Washington, D. C., William F. Tompkins, U. S. Atty., Newark, N. J., Edward V. Ryan, Asst. U. S. Atty., Jersey City, N. J., for United States.

the United States and the other defendants in this case.

Prior to May 14, 1950, defendant, The Kilgore Manufacturing Company of Westerville and Newark, Ohio, manufactured, under contract with the Government of Pakistan, a large quantity of anti-tank mines and anti-personnel mines, and detonators and fuses for the said mines. Some of these articles contained high explosives, classified by the Interstate Commerce Commission and the United States Coast Guard as Class A explosives.

Prior to May 1st, 1950, the Government of Pakistan engaged the services of the defendant, National Carloading Corporation, to expedite the shipment of these articles from the factories of Kilgore in Ohio to Karachi, Pakistan, pursuant to which National Carloading engaged space on the SS Flying Clipper, owned by defendant Isbrandtsen Company, Inc., and expected to sail May 18, 1950, to carry from the Port of New York to the Port of Karachi, 8,000 cases of anti-tank mines and a thousand cases of anti-personnel mines.

For 30 years prior to May 19, 1950, the Pennsylvania Railroad Company operated on the Raritan River at South Amboy, in the area commonly known as the Port of New York certain piers, one of which was known as the Powder Pier and was the only pier in the entire Port of New York from which commercial shipments of explosives were permitted to be unloaded from freight cars and transported by water to their domestic or foreign destinations.

On May 8, 1950, Rear Admiral Ed H. Smith, Commanding Officer of the Third United States Coast Guard District, in charge of the supervision of the movement and shipment of explosives in said district, issued the following directive:

"Due to the hazardous conditions which are deemed to exist in connection with explosives loading in Gravesend Bay and at South Amboy, N. J., the Commander, Third Coast Guard District has found it necessary to put into effect certain limitations with regard to Class A explosives.

"In accordance, therefore, with a directive from the Commander, Third Coast Guard District, effective this date, no permit will be granted by the Captain of the Port, New York, for any vessel to load or discharge Class A explosives in an amount in excess of 125,000 pounds in Anchorage 49–C, Gravesend Bay, and no permits will be granted for the loading or discharging of any amount of Class A explosives at South Amboy, N. J.

"The Class A explosives referred to above are those defined as such in the booklet Explosives Or Other Dangerous Articles On Board Vessels promulgated by the Commandant, U. S. Coast Guard, pursuant to 46 U.S.C. § 170.

"Class A explosives in amounts not exceeding 500 pounds may be handled, loaded, discharged, or transported without a permit from the Captain of the Port, subject to Federal, State, and local laws and regulations."

The above directive was published and each of the defendants received notice of it immediately after it was issued.

The Reading Company maintained and operated facilities at Artificial Island, below Wilmington, in the Delaware River, for the loading of explosives and other dangerous articles, which was known to all of the defendants.

On May 5 and 9, 1950, respectively, Kilgore, at the special instance of National Carloading, requested defendant, The Baltimore and Ohio Railroad Company, to place five cars at Vanatta, Ohio for loading of explosives and on May 10 and 12, ten freight cars were selected, approved and certified at Vanatta for the transportation of said explosives.

On May 11, 1950, defendant James Healing Company, agent of defendant National Carloading, for the purpose of receiving the shipment and transporting it by lighter or barge for loading on the

SS Flying Clipper, applied to the Commandant of the Navy Depot at Earle, New Jersey, for permission to allow the said shipment to go to the SS Flying Clipper through the facilities of the United States Navy at Earle, New Jersey, but on May 13th the request was denied.

On May 13, 1950, Kilgore, at the special instance of National Carloading, presented to The Baltimore and Ohio Railroad Company shipping orders and bills of lading made out by the defendant Kilgore, as directed by defendant National Carloading, for seven cars consigned to James Healing Company, c/o United States Navy, Earle, New Jersey for loading on the SS Flying Clipper and said seven cars were started over the lines of the defendant The Baltimore and Ohio Railroad Company on said May 13, 1950, at 10 p.m.

On May 14, 1950, Kilgore turned over three more cars loaded with mines and explosives to the defendant The Baltimore and Ohio Railroad Company consigned, on instructions of defendant National Carloading, to the same consignee and over the same route as the seven cars. They started toward their destination on May 15, 1950.

Both National Carloading and Kilgore knew when the bills of lading were in process of preparation for delivery to defendant The Baltimore and Ohio Railroad Company that no permission or authority had been issued by the United States Navy to receive ten carloads of ammunitions at Earle, New Jersey, for loading on the SS Flying Clipper and it is charged that the said bills of lading were prepared and the carloads of explosives started in interstate commerce with the purpose and intent on the part of National Carloading to divert them in transit to some other destination for trans-shipment in the SS Flying Clipper in the event the United States Navy should not permit the cars to pass through its facilities at Earle, New Jersey.

On May 15, 1950, defendant National Carloading sent a letter to Rear Admiral Ed. H. Smith in which said defendant represented that the manufacturer of said explosive mines "was ordered to route the cars here (to New York) and to defer their movement until yesterday (May 14), the latest possible date to connect with this vessel", which was represented as leaving New York on May 18. Said letter further stated that:

"Through a misunderstanding some of the cars were shipped earlier and may be in New York by tomorrow (May 16).

"As the Leonardo (Earle) facilities are definitely unavailable for commercial shipments, we respectfully request that in view of the shortness of time and the natural desire of our government to assist a friendly government, you permit this one shipment to be treated as an 'emergency' shipment and allow it to move through the facilities heretofore considered satisfactory.

"This would contemplate the cars moving to the Munitions pier of the Pennsylvania Railroad at South Amboy, New Jersey, and then lighted to such anchorage as you designate."

It is charged that statements in the said letter referring to the order to Kilgore to route cars to New York and to defer their movement until May 14th and the reference to the misunderstanding whereby some of the cars were shipped earlier and might be in New York by May 16th, were false to the knowledge of National Carloading. In addition, National Carloading gave a copy of the said letter to Isbrandtsen Company, Inc. and communicated with officers of the United States Coast Guard making the same false representations and urging a speedy decision by the United States Coast Guard on the request contained in its letter upon the representation that the cars loaded with explosives were in the New York area and constituted a menace to the inhabitants thereof, when none of the cars were in fact

in the New York area to the knowledge of defendant National Carloading.

On May 16, 1950, defendant Isbrandtsen Company, Inc. called the Commandant of the Third Coast Guard District and in the absence of Rear Admiral Ed. H. Smith, on account of illness, requested immediate action on the letter, but the Acting Commandant declined to overrule the directive of Rear Admiral Smith, issued May 8, 1950. Thereafter Captain H. W. Stinchcomb, Captain of the Port of New York, United States Coast Guard, by telephone, communicated the contents of the letter of May 15, 1950 of National Carloading to Captain Edward C. Cleave and Captain Roy L. Raney at Coast Guard Headquarters in Washington and advised them that several cars containing high explosives were in the New York area where they constituted a hazard making it advisable that the situation be deemed an emergency, and that an exception be granted to Rear Admiral Ed. H. Smith's directive and that permits be issued to transfer said explosives at South Amboy from the railroad freight cars to the lighters of defendant James Healing Co. for loading on the SS Flying Clipper on May 18, 1950. At the end of the telephone conversation without any inquiry or investigation Captain Stinchcomb was authorized to issue the permits.

Before any confirmation of the telephone message had been received at Coast Guard Headquarters in New York by Captain Stinchcomb, the United States Coast Guard in Washington informed defendant Isbrandtsen Company, Inc., defendant National Carloading and defendant James Healing Company that permission would be issued for the trans-shipment at South Amboy. Furthermore, Captain Stinchcomb on May 16, 1950, advised the Pennsylvania Railroad Company and others that the Coast Guard would issue permits for the loading on lighters at South Amboy of 1800 cases of dynamite in two carloads manufactured by Hercules Powder Company for shipment to Pakistan, via SS Flying Clipper

On said May 16, 1950, defendants National Carloading and Isbrandtsen Company, Inc., by their agents, requested the Pennsylvania Railroad Company, the plaintiff, to accept delivery from Reading Company at Belmont, Philadelphia County, Pennsylvania, of said ten cars that had been shipped from the Kilgore plants in Ohio and move the same to its pier at South Amboy and also two carloads of dynamite shipped by Hercules Powder Company, where they were to be unloaded by James Healing Company and transported by lighter to and loaded on the SS Flying Clipper. Plaintiff advised said defendants that it would not accept said proferred shipments because of the directive of the United States Coast Guard of May 8, 1950, whereupon the National Carloading and Isbrandtsen Company, Inc. informed plaintiff that they had been advised by the United States Coast Guard that it would issue permits for said shipments to pass through South Amboy. Plaintiff communicated with Captain Stinchcomb, the Captain of the Port of New York, who advised plaintiff that he would approve acceptance by plaintiff of said twelve cars for delivery to South Amboy and transfer by water to the SS Flying Clipper and that immediately thereafter the Coast Guard directive of May 8, 1950 would again become effective.

On May 17, 1950, defendant National Carloading wrote a letter to the plaintiff confirming that it had reconsigned the said ten carloads of ammunitions and explosives to South Amboy from Belmont, Pennsylvania.

On May 18, 1950, on the application of James Healing Co., Captain Stinchcomb issued permits for the explosives to be handled at South Amboy by lighter and loaded on the SS Flying Clipper on May 19, 20, 1950, within given hours.

On May 16, 1950, Hercules Powder Company, at Lake Junction, New Jersey, issued bills of lading which were accepted by the Central Railroad Company of New Jersey covering the shipment to South Amboy of two cars of high explosives consigned to itself, care

of James Healing Company for export on the SS Flying Clipper. Plaintiff received delivery of said two cars at Phillipsburg, New Jersey and delivered them to the consignee James Healing Company at its Powder Pier at South Amboy on May 19, 1950, with the explosive placard as required by law thereon.

Seven of the ten cars shipped by Kilgore were interchanged to plaintiff at Belmont, Philadelphia County, Pennsylvania, from the Reading Company on the morning of May 18th and the remaining three cars were shipped from Rutherford, Pennsylvania on May 18th, via Reading Company and Central Railroad of New Jersey to Oak Island, New Jersey, where they were interchanged to plaintiff and delivered to and accepted by defendant James Healing Company on their arrival at South Amboy on May 19, 1950.

At approximately noon of May 19, 1950, two of the Healing lighters had been fully loaded with 1800 cases of dynamite and 1000 cases of anti-personnel mines and were moved to the end of the pier and made fast there, while the remainder of said cars were unloaded into two other lighters.

At 7:28 p. m., on May 19, 1950, while the loading of the said lighters was in progress a violent explosion occurred and the entire shipment, the lighters, plaintiff's pier and the cars thereon, were totally destroyed and its property, building and facilities in the area were severely damaged.

The complaint then sets forth six causes of action against the following defendants respectively: (1) The Kilgore Manufacturing Company, (2) The Baltimore and Ohio Railroad Company, (3) National Carloading Corporation, (4) The Kilgore Manufacturing Company, The Baltimore and Ohio Railroad Company and National Carloading Corporation, (5) Isbrandtsen Company, Inc., (6) James Healing Co. and Healing & Son, Inc.

The seventh cause of action is stated to be against the defendant, United States of America. In it the plaintiff makes the following charges:

That the Commandant of the United States Coast Guard is granted authority under the federal law, 46 U.S.C.A. § 170 et seq., to regulate the transportation of explosives and that pursuant to said statute regulations were published April 9, 1941.

That it was provided in said regulations that Coast Guard District Commanders had vested in them general authority and responsibility for the administration and enforcement of the laws and regulations governing the transportation, storage, stowage, or use of explosives or other dangerous articles or substances on board vessels in the several Coast Guard Districts; that mines, detonating fuses are classified as "Explosives A", as maximum hazards, and that the anti-tank mines in the said shipment constituted high explosive articles classified as maximum hazards; that the enforcement of the provisions of the law and regulations shall be by the United States Coast Guard with appropriate power to carry out such enforcement; that the regulations promulgated by the Interstate Commerce Commission with respect to definitions, descriptions, descriptive names and classification of explosives and their containers and for the packing, marking, labeling and certification of such articles were adopted and formed part of the Coast Guard's regulations and that shipment of Class A explosives in amounts exceeding 500 pounds should not be laden or discharged from any vessel at any place in the United States until authorization for such loading or discharging had been obtained from the District Commander or other officers of the Coast Guard designated by the Secretary of the Treasury;

That by regulations it was provided that explosive projectiles, bombs, torpedoes, mines * * * should not be loaded or stowed together with detonating fuses or boosters;

That the Commandant of the United States Coast Guard on August 1, 1945

issued an order directing that "Explosives supervisory details of the Coast Guard are directed to render every assistance to the Navy, the Army and to owners, charterers, agents and masters of vessels in the stowage and transportation of these (explosive) cargoes."

The seventh count of the complaint goes on to allege that the United States was guilty of negligence in the following respects:

(a) On May 16, 1950, Captain H. W. Stinchcomb, Captain of the Port of New York, revoked a directive of the Commanding Officer of the Third Coast Guard District, issued on May 8, 1950, to permit a shipment of ten railroad box cars, containing 8,000 cases of anti-tank mines and 1,000 cases of anti-personnel mines that left the plants of the defendant The Kilgore Manufacturing Company in Ohio on May 13 and May 14, 1950, to be diverted to the Port of South Amboy for transfer to lighters for transportation to the SS Flying Clipper at a Government anchorage near Leonardo, New Jersey, requiring that the transportation and loading on lighters should move from South Amboy and should be accomplished between sunrise and sunset of May 19, 1950.

(b) On May 16 and May 18th, 1950, the said Captain Stinchcomb carelessly and negligently issued to the defendant James Healing Company a permit to unload at South Amboy two freight cars containing 1800 cases of dynamite from Hercules Powder Company to Kandahar, Afghanistan, for shipment on the said SS Flying Clipper in violation of the directive of the Commandant of the United States Coast Guard on May 8, 1950.

(c) That the said Captain Stinchcomb and other officers of the United States Coast Guard in deciding to issue permits for the shipment of the said material and in pro tanto revoking the directive of Rear Admiral Ed. H. Smith of May 8, 1950, purported to act upon the representations contained in a letter from defendant National Carloading Corporation, dated May 15, 1950, and upon verbal representations made to the said Captain Stinchcomb on May 16, 1950 by defendant Isbrandtsen Company, Inc. to the effect that some of said cars containing high explosives were in the New York City area and were a hazard to the New York metropolitan area, when in fact the ten railroad cars were in Pennsylvania on May 15th and May 16th, 1950, and at all times prior to the issuance of the permits on May 16, 1950, without making any independent inquiries either of the railroad over whose lines the said ten cars were being shipped or any other party to ascertain the truth of said statements or taking any further means to verify the allegations of fact contained in said letter of the National Carloading Corporation or defendant Isbrandtsen Company, Inc. of May 16, 1950.

(d) Captain Roy L. Raney and Captain Edward C. Cleave of the United States Coast Guard Headquarters in Washington, D. C. were careless and negligent:

(1) In granting verbal approval on May 16, 1950, to the said Captain Stinchcomb to issue the permits without directing verification of the facts contained in the letter of the defendant National Carloading Corporation of May 15, 1950.

(2) In recommending to the Commandant, United States Coast Guard, that an order be issued to Captain Stinchcomb to issue permits for the unloading at South Amboy of said ten cars of material for shipment by lighter to the SS Flying Clipper in New York Harbor.

(e) An Explosive Detail sent by Captain Stinchcomb to supervise the unloading of said freight cars and the loading of the contents of the same on the lighters of defendant James Healing Company was insufficient as it consisted only of Chief Engineman Ernest P. Stacey, who was negligent in the performance of his duties in supervising and directing the unloading of the cars and the loading of the contents thereof onto the lighters of the defendant James Healing Company in the following respects:

(1) Although he gave orders to the defendant James Healing Company to move from plaintiff's Powder Pier at South Amboy to a safe anchorage about noon of May 19, 1950, after it had loaded two lighters containing 1800 cases of dynamite and a large quantity of anti-personnel mines and renewed his order some hours after noon on that day he took no method or means to have his order obeyed.

(2) He permitted the said two loaded lighters to remain moored at the end of plaintiff's Powder Pier from approximately noon on May 19, 1950, until their cargo was exploded at 7:28 p. m. on May 19, 1950.

(3) He carelessly and negligently permitted boxes containing anti-tank mines, fuses and detonators to be packed together in violation of the regulations of both the Interstate Commerce Commission and the United States Coast Guard to be unloaded from the railroad freight cars into said lighters.

(4) That he was inattentive to his duties in that he did not remain at the Powder Pier until the unloading was completed, but absented himself for considerable periods during the day permitting the loading to continue without any supervision of the United States Coast Guard and that in his absence defendant James Healing Company speeded up its operations with an insufficient and weary crew in order to complete the loading by sunset during the course of which the explosion occurred.

(5) That he made no attempt to secure the aid of the United States Coast Guard to remove the loaded lighters to a safe anchorage, did not direct defendant James Healing Company to remove said lighters in the face of his observation that the defendant James Healing Company did not have sufficient longshoremen at work to complete the unloading by sunset without the use of the officers and crew of the loaded lighters which were moored at the outer end of Powder Pier contrary to his orders.

(6) That he did not stop the unloading of the said material when he observed that the boxes were loaded with fuses and detonators in violation of the regulations of the Interstate Commerce Commission and the United States Coast Guard; or he was inattentive to his duties and did not discover that the said boxes contained material in violation of the regulations.

(7) That he paid no heed to the fact that the said mines and fuses and detonators were packed loosely in the boxes, or observing that the said explosives were loosely packed, did not stop the loading or cause extra or special care in the handling of the said boxes and did not notify the officials of the Coast Guard concerning the manner of the packing of the said boxes.

The plaintiff alleges that the explosion destroyed or damaged its property and deprived it of the use of its facilities to its damage in the sum of $4,000,000.

In addition to the direct damages sustained by the plaintiff, many parties have asserted claims against the plaintiff for personal injuries and property damages by way of suits in courts of law in the States of Ohio, New Jersey, New York and in this court. It demands indemnity against the United States not only for its direct damages, but for any damages that may be assessed against it in any of the said lawsuits which aggregate in claims approximately $40,-000,000.

The first count of the complaint of the A. & M. Trading Corporation, et al. v. United States, Civil No. 449–52 is more general in nature than the complaint of the Pennsylvania Railroad Company.

In the second count A. & M. Trading Corporation, et al., incorporate by reference their allegations of the first count and charges that these constituted a nuisance.

The allegations in the other two cases, Frances Rinn, Admx., etc. v. United States, Civil No. 973–50 and Ethel M. Geary v. United States, Civil No. 367–52, are substantially the same as those recited in the Pennsylvania Railroad case and the first count of the A. & M. Trading Corporation complaint.

The four complaints were to be regarded as a composite complaint for the purpose of argument on the Government's motion to dismiss. They are all founded upon alleged liability of the United States as governed by the provisions of the Federal Tort Claims Act, and are discussed in this motion particularly as they are affected by 28 U.S.C.A. c. 85, § 1346(b) [1] and 28 U.S.C.A. c. 171, § 2680(a) [2].

In support of its motion to dismiss the complaint, the defendant cited the decision of the United States Supreme Court in the case of Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427. It was a test case representative of many suits against the United States filed by reason of a disaster at Texas City, Texas, the result of an explosion of ammonium nitrate fertilizer produced at the instance, according to the specifications, and under control, of the United States, for export, to increase the food supply in areas under military occupation following World War II. As a result of the catastrophe many lives were lost and much property damage ensued. It was charged that the explosion resulted from negligence of the Government in adopting the fertilizer export program as a whole, in its control of various phases of manufacturing, packaging, labeling and shipping the product, in failing to give notice of its dangerous nature and in failing to police its loading on shipboard.

In interpreting the legislative history of the acceptance of the Government's exposure to suits under the Tort Claims Act, and the general exemption as expressed in § 2680(a), the Supreme Court emphasized a paragraph from the House Report of the 77th Congress, characterizing the general exemption as being:

" 'a highly important exception, intended to preclude any possibility that the bill might be construed to authorize suit for damages against the Government growing out of authorized activity, such as a flood control or irrigation project, where no negligence on the part of any government agent is shown, and the only ground for the suit is the contention that the same conduct by a private individual would be tortious. * * * The bill is not intended to authorize a suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion.' " 346 U.S. at page 30, 73 S.Ct. at page 965.

In defining discretion the Court at pages 35–36 of 346 U.S., at page 968 of 73 S.Ct., stated:

"It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where

---

1. "Subject to the provisions of chapter 171 of this title, the district courts, * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C.A. c. 85, § 1346(b).

2. "The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S. C.A. c. 171, § 2680(a).

there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion."

In determining that the negligence alleged in the complaint would not subject the Government to liability, the Court stated at page 42 of 346 U.S., at page 971 of 73 S.Ct.:

"The decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program."

Finally the Court discussed the theory of absolute liability without fault upon the part of the Government and the contention of plaintiff that the Government had been guilty of maintaining a nuisance. The Court held that the Tort Claims Act does not extend to such situations and is to be invoked only on a "negligent or wrongful act or omission" of an employee. It said:

"Absolute liability, of course, arises irrespective of how the tortfeasor conducts himself; it is imposed automatically when any damages are sustained as a result of the decision to engage in the dangerous activity. The degree of care used in performing the activity is irrelevant to the application of that doctrine. But the statute requires a negligent act. So it is our judgment that liability does not arise by virtue either of United States ownership of an 'inherently dangerous commodity' or property, or of engaging in an 'extra hazardous'

activity." 346 U.S. at pages 44–45, 73 S.Ct. at page 972.

The defendant relies heavily upon the Dalehite case. It argued that these cases come precisely within the exception in the Act, 28 U.S.C.A. § 2680(a), as interpreted in that case, because, it averred, the promulgation of the directive by the Commandant of the Coast Guard of May 8, 1950, prohibiting the unloading of explosives at South Amboy and the revocation thereof, constituted discretionary action.

The defendant also contended that the failure to enforce its regulatory control of inspection laws could not be a basis of liability. It cited many cases to the effect that a state or city is not liable for failing to enforce regulatory control of inspection laws or ordinances which have been enacted.

It further urged that in the cases at bar the finding of liability in the United States for creation of a non-negligent nuisance or for liability without fault was precluded by the statutory terms of the Tort Claims Act and its built-in exceptions. It also felt fortified by the Dalehite case in this regard.

Plaintiffs, among other arguments, asserted that their complaints contained charges of negligence insusceptible of dismissal in the following regard:

(1) That the Captain of the Port of New York and various officers on the staff of the Commandant of the Coast Guard in Washington revoked the order of May 8, 1950 without adequate investigation of the alleged emergency proposed as justifying such action.

(2) That the Captain of the Port of New York issued a permit for the loading of the explosives at South Amboy without taking steps to ascertain whether the regulations of the Coast Guard and Interstate Commerce Commission were complied with.

(3) That the Coast Guard enlisted man detailed to supervise the lighterage and loading of the explosives failed to execute direct orders given to him by

his superior officer and countenanced plain and flagrant violations both of those orders and of Coast Guard and Interstate Commerce Commission regulations governing packaging and handling of explosives.

In an age where the transfer, storage and handling of explosives of a character never so dangerous in the world's history, within close proximity to, or in the midst of the densest population of the country, where interstate or other federal justification is involved, it could be expected that the national government would concern itself with so regulating the traffic in those commodities as to afford the minimum hazard of annihilation of the lives and destruction of the property of the citizens. Certainly such a motive must have prompted the Congress when it provided a preamble and legislation in 1940, as follows:

"(7) In order to secure effective provisions against the hazards of health, life, limb, or property created by explosives or other dangerous articles or substances to which subsection (3), (4), (5), or (6) of this section apply—

"(a) The Secretary of Commerce shall by regulations define, describe, name, and classify all explosives or other dangerous articles or substances, and shall establish such regulations as may be necessary to make effective the provisions of this section with respect to the descriptive names, packing, marking, labeling, and certification of such explosives or other dangerous articles or substances; with respect to the specifications of containers for explosives or other dangerous articles or substances; with respect to the marking and labeling of said containers; and shall accept and adopt for the purposes above mentioned in this subsection such definitions, descriptions, descriptive names, classifications, specifications of containers, packing, marking, labeling, and certification of explosives or other dangerous articles or substances to the extent as are or may be established from time to time by the Interstate Commerce Commission insofar as they apply to shippers by common carriers engaged in interstate or foreign commerce by water. The Secretary of Commerce shall also establish regulations with respect to the marking, handling, storage, stowage, and use of explosives or other dangerous articles or substances on board such vessels; with respect to the disposition of any explosives or other dangerous articles or substances found to be in an unsafe condition; with respect to the necessary shipping papers, manifests, cargo-stowage plans, and the description and descriptive names of explosives or other dangerous articles or substances to be entered in such shipping documents; also any other regulations for the safe transportation, carriage, conveyance, storage, stowage, or use of explosives or other dangerous articles or substances on board such vessels as the Secretary of Commerce shall deem necessary; and with respect to the inspection of all the foregoing mentioned in this paragraph. * * *" 54 Stat. 1025.

The duties above described, of the Secretary of Commerce, were transferred to the Commandant of the Coast Guard by Reorganization Plan No. 3, 60 Stat. 1097, which was in effect on the date of the explosion in this case and the law as thus affected is found in 46 U.S. C.A. § 170.[3]

3. The following amendment was added on July 16, 1952 as a result of Congressional investigation of the explosion in this case:
"(e) The United States Coast Guard shall issue no permit or authorization for the loading or discharging to or from any vessel at any point or place in the United States, its territories or possessions (not including Panama Canal Zone) of any explosives unless such explosives, for which a permit is required by the regulations promulgated pursuant to this

Under such statutory authority the Interstate Commerce Commission[4] and the Coast Guard[5] from time to time promulgated regulations defining conditions and duties regarding the shipment of dangerous articles[6] which were in

section, are packaged, marked, and labeled in conformity with regulations prescribed by the Interstate Commerce Commission under section 835 of Title 18, and unless such permit or authorization specifies that the limits as to maximum quantity, isolation and remoteness established by local, municipal, territorial, or State authorities for each port shall not be exceeded. Nothing herein contained shall be deemed to limit or restrict the shipment, transportation, or handling of military explosives by or for the Armed Forces of the United States." 46 U.S.C.A. § 170(e).

4. 49 C.F.R., c. 1, parts 71–78.

5. 46 C.F.R., c. 1, subc. N, part 146. Some of these regulations, particularly pertinent to this case, are as follows:

"Enforcement. (a) The provisions of R.S. 4472, as amended, and the regulations in this subchapter shall be enforced by the U. S. Coast Guard of the Department of the Treasury. Enforcement officers may at any time and at any place within the jurisdiction of the United States board any vessel for the purpose of enforcing the provisions of the regulations in this subchapter." 46 C.F.R. § 146.02–6.

"Acceptable shipments. (a) Permitted explosives or other dangerous articles or substances may be offered to vessels for transportation and storage provided they are in proper condition for transportation or storage and are as defined and are packed, marked, labeled, described, certified and otherwise acceptable as provided for herein. Methods of preparation, packing, testing and records, insofar as they effect safety in transportation shall be open to inspection by a duly authorized representative of the U. S. Coast Guard." 46 C.F.R. § 146.05–2.

"Authorization to load or discharge explosives. Shipments of Class A explosives in amounts exceeding five hundred (500) pounds shall not be laden on or discharged from any vessel at any point or place in the United States, its territories or possessions (not including the Panama Canal Zone) until authorization for such loading or discharging has been obtained by the owner, agent, charterer, master or person in charge of the vessel from the District Commander or other officer of the Coast Guard designated by the Secretary of the Treasury for such purposes." 46 C.F.R. § 146.20–42.

"Definitions and abbreviations. For the purpose of the regulations in this subpart, military explosives are defined as follows:

"(a) Military explosives. Military explosives consist of all I.C.C. Class A, B, or C, explosives shipped by, for * * * or to the government of any country whose defense is deemed vital to the defense of the United States * * *." 46 C.F.R. § 146.29–6.

"Permit to load explosives. Owners, charterers, agents, the master of the vessel or other person in charge of the vessel shall not accept on board a vessel any military explosives or ammunition or military lethal chemicals as cargo until a permit authorizing such loading has been granted by the Captain of the Port." 46 C.F.R. § 146.29–7.

"Application for permit to load explosives. Owners, charterers, agents, the master of a vessel, or other person in charge of the vessel are required to file with the Captain of the Port a written application for a permit authorizing the loading on board a vessel of explosives as cargo. When filed, the application shall be accompanied by a preliminary cargo stowage plan showing the proposed stowage of the military explosives or ammunition. In addition there shall also be shown on the preliminary cargo stowage plan the proposed stowage of any other dangerous cargo as defined in the regulations in this part. A preliminary manifest of all the explosives and other dangerous articles comprising the cargo of the vessel shall also accompany the application for permit. Changes in the final stowage from that shown on the preliminary cargo stowage plan may be made upon approval of the Captain of the Port." 46 C.F.R. § 146.29–8.

"Explosives loading detail.

"(a) There may be assigned to every vessel, subject to the regulations in this part, loading or discharging military explosives at an explosives anchorage, explosives loading pier or an ammunition loading pier, a Coast Guard detail to supervise such loading or discharge. The owners, agents, charterers, master or person in charge of the vessel and all persons engaged in the handling, loading, and stowage of the military explosives shall obey all orders, oral or written, that are given by the person in charge of said detail." 46 C.F.R. § 146.29–31.

6. An index to the seriousness with which these regulations were to be regarded

effect at the time of the explosion in this case.

The action of the Captains Raney and Cleave [7] at the Headquarters in Washington on May 16, 1950, when they recommended "that an order be issued to Captain Stinchcomb, Captain of the Port of New York, to issue permits for the unloading at South Amboy of said ten cars containing anti-tank mines and anti-personnel mines * * *" (Complaint of Pennsylvania Railroad Company, par. 59(d)(2) ) is characterized as negligent because the decision was made without inquiry as to the facts submitted. Plaintiffs claim that the determination of the officers at Washington under such circumstances gives rise to a claim against the Government not interdicted by § 2680(a) or the Dalehite case.

■■ Granting that the complaints charge that Captain Stinchcomb was ordered by his superior officers to issue the permits that directive should be viewed in a broad light. It could mean only that the permits were to be issued as an emergency measure notwithstanding the directive of May 8, 1950 restricting the use of the facilities at South Amboy, but that otherwise they were to be issued providing only that the normal conditions were met by the applicants. There is nothing to indicate that any of the other regulations surrounding permission for the loading and handling explosives were to be waived. The applicant for the permits was to stand in no more preferred position than an applicant for a permit at a place designated as available for the handling of such commodities free of any restriction. The only

preferment to be accorded was that for this one emergency the limitation of the use of the Powder Pier at South Amboy was to be lifted. The exercise of discretion by the officers in Washington to lift the restriction terminated with their decision so to do. The decision by these officers to suspend the restriction as an emergency measure was a policy and discretionary act, the liability for which upon the part of the United States is exempt by virtue of § 2680(a) and the decision of the United States Supreme Court in the Dalehite case.

Thereafter Captain Stinchcomb had no discretionary function. His duty was to issue the permits, provided only, that the normal qualifications were met by the applicant. The issue then arises as to whether Captain Stinchcomb made reasonable inquiry as to this before actually handing over the permits. To this extent the complaints are sufficient and the defendant's contention that their allegations are without foundation and subject to dismissal, must fail.

■ Next we come to those allegations which deal with the part played by Chief Engineman Stacey. According to the allegations of the complaint of the Pennsylvania Railroad Company, he was ordered to act as the inspection and supervisory detail for the Coast Guard in connection with the loading for which the permits had been granted. Specific negligent acts of omission and commission are set forth in the complaints as having been committed by him in his execution of his orders. In his instance there was no discretion for him to exercise. The language of the Dalehite case,

may be gathered from the language of an order issued by Admiral R. R. Waesche, Commandant of the United States Coast Guard, wherein it was stated, among other things, that "Explosives supervisory details of the Coast Guard are directed to render every assistance to the Navy, the Army, and to owners, charterers, agents and masters of vessels in the stowage and transportation of these (explosive) cargoes." Complaint of Pennsylvania Railroad Co., par. 58.

7. Whether or not specific authority to issue the permits for the shipment of dynamite by Hercules Powder Company was ever directed by the Headquarters of the Coast Guard at Washington or whether Captain Stinchcomb simply decided that the request for this permit was covered by the grant of authority in connection with the ten carloads of munitions and explosives is not made clear by the complaint.

"It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion." 346 U.S. at page 36, 73 S.Ct. at page 968.

does not read on his alleged activity so as to exculpate the defendant from liability. He was not acting in the character of a subordinate "in carrying out the operations of government in accordance with official directions". In fact, the "action or non-action" upon his part was not directed by his superior officer in any manner. His was the simple duty to carry out a lawful routine order which it is charged he failed to execute. It was not the order to supervise and inspect that was the "causal step" but it was his alleged neglect to carry out his orders that was the "causal step." A triable issue in this regard is raised in the complaints and here again the contention of the defendant that the complaints fail to state a legal claim cannot be sustained.

This view is fortified by the case of Somerset Seafood Co. v. United States, 4 Cir., 1951, 193 F.2d 631 [8] in which the Government was sued under the Tort Claims Act for damages for the sinking of the plaintiff's oyster boat which became stranded on the wreck of the old battleship Texas, sunk in 1911 in the navigable waters of Chesapeake Bay. It was alleged that the loss of the boat was due solely to the negligence of the Government in creating and marking the wreck. This case was decided before the Dalehite opinion came down from the Supreme Court, but the Government there as in the Dalehite case and here stressed the exemption clauses of the

Act, § 2680, and relied upon the case of Feres v. United States, 1950, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152. The Court disposed of the Feres case as a controlling authority in the following words,

"There is nothing in the celebrated case of Feres-Jefferson-Griggs v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, which militates against our conclusion, which was also that of the District Judge. All that case really decided was 'the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries (arose) out of or are in the course of activity incident to service.' 340 U.S. at page 146, 71 S.Ct. at page 159. Mr. Justice Jackson in his opinion 340 U.S. at page 139, 71 S.Ct. at page 156, remarked: 'The Tort Claims Act was not an isolated and spontaneous flash of congressional generosity. It marks the culmination of a long effort to mitigate unjust consequences of sovereign immunity from suit.'" 193 F.2d 631, at page 634.

The Court held that the Wreck Acts, 33 U.S.C.A. §§ 409, 736, 14 U.S.C.A. § 86 imposed on the Government a duty of marking or removing a wreck, the appropriate offices and federal agencies deciding merely the proper methods or measures.

The Court went on further to say:

"In addition to this, we think that, even if the decision to mark or remove the wreck be regarded as discretionary, there is liability for negligence in marking after the discretion has been exercised and the decision to mark has been made. There is certainly no discretion to mark a wreck in such way as to constitute a trap for the ignorant or unwary rather than a warning of danger. See Johnston v. District

8. The decision in this case is criticized in an opinion in the case of Clark v. United States, D.C., 109 F.Supp. 213. That case, however, dealt with flood water control, distinctly on the policy and planning level.

of Columbia, 118 U.S. 19, 6 S.Ct. 923, 30 L.Ed. 75; Costley v. United States, 5 Cir., 181 F.2d 723; Toledo v. United States, D.C., 95 F.Supp. 838; Dishman v. United States, D.C., 93 F.Supp. 567, 571. As said by Judge Chesnut in the case last cited: 'This exception is not applicable here. This is not a case in which in the exercise of discretion or judgment the officials of the Veterans Hospital declined to give the plaintiff treatment, but it is a case where having exercised their discretion to give the treatment, in accordance with the applicable regulations, the treatment given was negligent.' " 193 F.2d at page 635.

 It would appear that a similar duty reposed in the Coast Guard to protect the public against the loading and storage of explosives under the so-called "Explosives Act," 46 U.S.C.A. § 170. Once having undertaken to exercise such supervision the duty devolved upon the Government to complete it in a manner reasonably free from carelessness. This the plaintiffs say in their complaints was not done.

In the case of Smith v. United States, D.C., 116 F.Supp. 801, 802, the Court undertook to review a prior decision, reported in 113 F.Supp. 131, made by it denying a Government motion to dismiss a complaint under the Tort Claims Act because the Dalehite decision had come down shortly thereafter. The Court analyzed the Dalehite case briefly, but succinctly, and concluded:

"The breadth of that decision" (the Dalehite case) "was not intended to comprehend the acts of subordinates done within the scope of their employment but either contrary to the directions of a Plan or under no Plan at all. This is what plaintiff Smith wants an opportunity to prove, that his damages were caused by non-discretionary steps in the construction of the Base. For aught we know, the damage may have been due to negligent disregard, rather than strict observ-

ance, of the Army's plans and specifications. Such is actionable negligence under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 et seq., as interpreted in Dalehite v. United States, supra. On the motion to dismiss, defendant has not, as was said in the prior opinion, established the 'certainty of no right to relief' which must attend dismissal." 116 F.Supp. 801, at page 802.

The attending circumstances in this case make the holding above quoted parallel here.

The plaintiffs urged that since the Tort Claims Act specifically fixed the Government's liability to be the same as that of a private person in accordance with the law of the place where the act or omission occurred, 28 U.S.C.A. § 1346 (b) or "in the same manner and to the same extent as a private individual under like circumstances", 28 U.S.C.A. § 2674, the law governing the liability of a municipal corporation in New Jersey should prevail in this case.

On the other hand the defendant contended that the complaints here exhibit no greater right to relief than one could claim for injuries alleged to have been received through the failure of the city or state to enact control laws which would have prevented injury had they been passed and enforced and that there had been, to quote the Dalehite case, no "change (in) the normal rule that an alleged failure or carelessness of public firemen does not create private actionable rights." 346 U.S. at page 43, 73 S.Ct. at page 972. Further, that the standard of liability was to be measured by that of a "private person" or "private individual", in accordance with the specific words used in the Act and not by that of a municipal corporation.

 In the case of Gilroy v. U. S., D.C.D.C.1953, 112 F.Supp. 664, the Court held as to this:

"The words, 'as a private individual', are not used as words of art or as a limitation, but, rather, in a

descriptive manner to indicate that the United States should be liable in the same manner and to the same extent as anyone else. A municipal corporation may be considered for the purposes of that provision as a private individual, and, therefore, it is the view of this Court that the liability of the United States in respect to defects in the streets that it controls is the same as the liability of a municipality in the same jurisdiction, or the liability of any other political subdivision in control of streets." 112 F. Supp. at page 666.

Although the defendant characterizes this holding as "isolated" and of "no precedental value" I find myself in agreement with it. Moreover, in O'Toole v. U. S., 3 Cir., 1953, 206 F.2d 912, the Court of Appeals of this Circuit noticed the above language approvingly.

█ In New Jersey the common law rule insulating municipal corporations from liability for damages has been relaxed to the extent that today such a corporation is held liable for damages when they have been the result of active wrongdoing or misfeasance upon the part of the corporation. Although the doctrine of respondeat superior does not apply to them, they cannot escape the results of acts causing injury where they undertake to put into motion the forces which induce the injury. Allas v. Borough of Rumson, 1935, 115 N.J.L. 593, 181 A. 175, 102 A.L.R. 648; Milstrey v. City of Hackensack, 1951, 6 N.J. 400, 79 A.2d 37; Kress v. City of Newark, 1952, 8 N.J. 562, 86 A.2d 185.

Of course, the application of New Jersey law cannot affect the specific directives of federal legislative enactment such as the exemption of liability for which provision is made in § 2680(a) which as we have held does not at this stage affect the complaints herein. Indeed, these complaints do not need to rest exclusively upon the theory of liability or non-liability of municipal corporations under the New Jersey law since the allegations are supported otherwise as has been stated.

Stress was also placed by the defendant upon the proposition that the Coast Guard could not render the Government liable under the Tort Claims Act for its failure to attempt to, or ineffectual effort at, rescue as held in Lacey v. U. S., D.C.Mass.1951, 98 F.Supp. 219, and P. Dougherty Company v. U. S., 3 Cir., 1953, 207 F.2d 626. (Not an action under the Tort Claims Act). Indeed, the Supreme Court in the Dalehite case commented that the alleged failure of the Coast Guard to fight the fire in that case was beyond the reach of the Act, concluding that

> "To impose liability for the alleged non-feasance of the Coast Guard would be like holding the United States liable in tort for failure to impose a quarantine for, let us say, an outbreak of foot-and-mouth disease." 346 U.S. at page 44, 73 S.Ct. at page 972.

In these complaints, however, we are met with charges that are different from those in the cases cited. In them the concern in this respect was with conduct associated with the aftermath of disaster. In the complaints under scrutiny, allegations are made that acts of negligence in the performance of routine functions not discretionary or on a policy or planning level were the contributing proximate cause of the injuries and part of the inducing force that brought on the disaster.

Finally, the suggestion of the defendant that it may not be chargeable with the maintenance of a nuisance, without more, seems to be borne out by the language of the Court in the Dalehite case, quoted on pages 18 and 19 hereof [124 F.Supp. 61]. But here we are not confronted with allegations of liability arising out of "United States ownership of an 'inherently dangerous commodity' or property, or of engaging in an 'extra hazardous' activity" but with specific allegations of negligent acts upon the part of its agents not within the exemptions provided in the Tort Claims Act.

No purpose can be served by exploring here in detail the many other "side" theories projected by the parties involving many citations to cases and authorities, all of which have been considered, but throw no additional light upon the subject.

Viewed, at this stage of the proceedings, as they are entitled to be, in the light most favorable to the plaintiffs, it is concluded that the complaints herein disclose allegations which state claims upon which relief can be granted under existing law. Therefore defendant's motions to dismiss the complaints must be denied.

An order should be submitted in conformity herewith in such form that a copy thereof may be filed in each case affected.